# EXHIBIT B

16-2019-CA-007337-XXXX-MA Div: CV-B

Filing # 97330972 E-Filed 10/15/2019 05:37:45 PM

10/22/19    10:30ᴅ

RP    10:74'

## IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL
## CIRCUIT IN AND FOR DUVAL COUNTY, FLORIDA

| | |
|---|---|
| CHERRAE CLARK, on behalf of herself and all others similarly situated, | CASE NO.: |
| | **CLASS ACTION** |
| **Plaintiff** | |
| | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| NORTH FLORIDA OB GYN, LLC, WOMEN'S CARE FLORIDA, LLC and PHYSICIAN BUSINESS SERVICES, LLC | **DEMAND FOR JURY TRIAL** |
| **Defendants** | |

## SUMMONS

**THE STATE OF FLORIDA:**

To all and singular Sheriffs of said state:

YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint in the above-styled cause upon the Defendant:

**NORTH FLORIDA OB GYN, LLC**
c/o REGISTERED AGENT
Marmelstein, Erin
11437 CENTRAL PARKWAY, SUITE 105
JACKSONVILLE, FL 32224

Each Defendant is hereby required to serve written defenses to said Complaint or Petition on:

John Yanchunis, Esquire
**Morgan & Morgan Complex Litigation Group**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505 // FAX: (813) 223-5402
E-Mail: jyanchunis@forthepeople.com
        jcabezas@forthepeople.com

# EXHIBIT B

ACCEPTED: DUVAL COUNTY, RONNIE FUSSELL, CLERK, 10/16/2019 09:13:18 AM

within *twenty (20) days* after service of this Summons upon you, exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on Plaintiff's attorney or immediately thereafter. If you fail to do so, a default will be entered against you for the relief demanded in the Complaint or Petition.

- If you have a disability and would like to request court documents be made available in a specific format, email the Clerk of Court's **ADA Coordinator** or call (904) 255-2355. In addition, our ADA Coordinator is available to assist all persons with disabilities who need accommodations when interacting with the Clerk of the Court, or who need modifications to the Clerk of Court's policies, practices, and procedures due to a disability.

- If you have a disability, and the format of any material on our web pages interferes with your ability to access the information, please email the Clerk of Court's **ADA Coordinator** or call (904) 255-2355. To enable us to respond in a manner most helpful to you, please indicate the nature of the accessibility problem, the web address of the requested material, your preferred format in which you want to receive the material (electronic format (ASCII, etc.), standard print, large print, etc.), and your contact information.

- If you wish to file a complaint under the Americans with Disabilities Act (ADA), or a complaint about the inaccessibility of court documents or the Clerk of Court's website, email the Clerk of Court's **ADA Coordinator** or call (904) 255-2355.

- If you need special assistance due to a disability to participate in a court proceeding, please contact the **Fourth Circuit Court Administration ADA Coordinator** at the address or phone number below at least 7 days before your scheduled court appearance or immediately upon receiving an official notification if the time before the scheduled appearance is less than 7 days. If you are hearing or voice impaired, call 711.

WITNESS my hand and the seal of this Court on this the __16__ day of ___Oct___,
2019.

Ronnie Fussell

**CLERK OF THE CIRCUIT COURT**

By: _Christine Kent_
_____

as Deputy Clerk

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera; si usted desea que el tribunal considere su defensa, debe presentar su repuesta por escrito, incluyendo el numero del caso y los numbres de las partes interesadas en dicho caso. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado immediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su centa, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted inviar por correo o entregar una copia de su respuesta a la persona denuminada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demanadante).

"De acuerdo con el Acto o' Decreto de los Americanos con Impedimentos Inhabilitados, personas en necesidad del servicio especial para particpar en estee procedimiento deberan, dentro de un tiempo razonable, antes de cualquier procedimiento, ponerse en un tiempo razonable, antes de cualquier procedimiento, ponerse en contacto con la oficina Administrativa de la Corte, Telefono (TDD) 1-800-955-8771 o (V) 1-800-955-8770, via Florida Relay System."

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet'te citation pour deposer une response ecrite a la plainte ci-jointe aupres de ce Tribunal. Un simple coup de telephone est insuffisant pour vous proteger' vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le Tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une response ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au carbone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

En accordance avec la Loi des "Americans With Disabilities". Les personnes en besoin d'une accomodation speciale pour participer a ces procedures doivent, dans un temps raisonable, avant

d'entreprendre aucune autre demarche, contracter l'office administrative de la Court situe au le telephone ou Telefono (TDD) 1-800-955-8771 ou (V) 1-800-955-8770, via Florida Relay System."

**Morgan & Morgan Complex Litigation Group**
**201 N. Franklin Street, 7th Floor**
**Tampa, Florida 33602**

Filing # 97330972 E-Filed 10/15/2019 05:37:45 PM

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

I.      **CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>FOURTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>DUVAL</u>  COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>CHERRAE CLARK</u>
Plaintiff
        vs.
<u>WOMEN'S CARE FLORIDA, LLC, PHYSICIAN BUSINESS SERVICES, LLC, NORTH FLORIDA OB GYN, LLC</u>
Defendant

II.      **TYPE OF CASE**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☒ Negligence – other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability – commercial
    ☐ Premises liability – residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure $0 - $50,000
    ☐ Commercial foreclosure $50,001 - $249,999
    ☐ Commercial foreclosure $250,000 or more
    ☐ Homestead residential foreclosure $0 – 50,000
    ☐ Homestead residential foreclosure $50,001 - $249,999
    ☐ Homestead residential foreclosure $250,000 or more
    ☐ Non-homestead residential foreclosure $0 - $50,000

☐ Non-homestead residential foreclosure $50,001 - $249,999
☐ Non-homestead residential foreclosure $250,00 or more
☐ Other real property actions $0 - $50,000
☐ Other real property actions $50,001 - $249,999
☐ Other real property actions $250,000 or more

☐ Professional malpractice
    ☐ Malpractice – business
    ☐ Malpractice – medical
    ☐ Malpractice – other professional
☐ Other
    ☐ Antitrust/Trade Regulation
    ☐ Business Transaction
    ☐ Circuit Civil - Not Applicable
    ☐ Constitutional challenge-statute or ordinance
    ☐ Constitutional challenge-proposed amendment
    ☐ Corporate Trusts
    ☐ Discrimination-employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order. Yes ☐ No ☒

**III.**  **REMEDIES SOUGHT** (check all that apply):
- ☒ Monetary;
- ☒ Non-monetary declaratory or injunctive relief;
- ☐ Punitive

**IV.**  **NUMBER OF CAUSES OF ACTION: (    )**
(Specify)

7

**V.**  **IS THIS CASE A CLASS ACTION LAWSUIT?**
- ☒ Yes
- ☐ No

**VI.**  **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
- ☒ No
- ☐ Yes – If "yes" list all related cases by name, case number and court:

**VII.**  **IS JURY TRIAL DEMANDED IN COMPLAINT?**
- ☒ Yes
- ☐ No

---

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature s/ John Yanchunis Sr.          FL Bar No.: 324681
    Attorney or party                                   (Bar number, if attorney)

John Yanchunis Sr.   10/15/2019
    (Type or print name)                               Date

Filing # 97330972 E-Filed 10/15/2019 05:37:45 PM

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL
CIRCUIT IN AND FOR DUVAL COUNTY, FLORIDA

| | |
|---|---|
| CHERRAE CLARK, on behalf of herself and all others similarly situated, | CASE NO.: |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF** |
| NORTH FLORIDA OB-GYN, LLC, WOMEN'S CARE FLORIDA, LLC and PHYSICIAN BUSINESS SERVICES, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Cherrae Clark ("Plaintiff"), by and through her undersigned counsel, brings this

class action lawsuit against Defendants North Florida Ob-Gyn, LLC, Women's Care Florida, LLC,

and Physician Business Services, LLC (collectively, "Defendants" or "NFOBGYN"), on behalf

of herself and all others similarly situated, and alleges, based upon information and belief and the

investigation of her counsel as follows:

### INTRODUCTION

1.      NFOBGYN is the largest independent women's health practice in Jacksonville,

Florida, providing obstetrics, gynecology and urogynecology services in 38 locations across

northern Florida.

2.      On or about October 1, 2019, NFOBGYN announced that its computer systems had

been breached by unauthorized third parties on or before April 29, 2019. The breach went

unnoticed by NFOBGYN until July 27, 2019, at which time their computer systems were shut

down and incident response and recovery procedures were commenced. A subsequent

investigation revealed that the intruders had unfettered access to sensitive personally identifiable

information and protected health information of NFOBGYN patients (collectively, "PII") for

1

nearly three months.[1] The exposed PII included patient names, demographic information, dates of birth, Social Security numbers, driver's license or identification card numbers, employment information, health insurance information, and health information, such as treatment, diagnosis, and related information and medical images ("Data Breach"). The Data Breach affected 528,188 patients.

3. Although the Data Breach occurred on or before April 29, 2019, it was not discovered by NFOBGYN until three months later on July 27, 2019. Worse yet, NFOBGYN took more than two months to notify affected patients, thereby depriving them of the ability to promptly mitigate potential adverse consequences.

4. This Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patient PII.

5. Defendants disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure that their data systems were protected against unauthorized intrusions; failing to disclose that they did not have adequately robust computer systems and security practices to safeguard patient PII; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that, on its face, expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number). Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, ("HIPAA"), protected health information ("PHI") is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

6.      As a result of Defendants' failure to implement and follow basic security procedures, patient PII is now in the hands of thieves. Plaintiff and Class Members have had to spend, and will continue to spend, significant amounts of time and money in an effort to protect themselves from the adverse ramifications of the Data Breach and will forever be at a heightened risk of identity theft and fraud.

7.      Plaintiff, on behalf of all others similarly situated, alleges claims for negligence, negligence *per se*, invasion of privacy, breach of implied contract, breach of fiduciary duty, breach of confidence, and violation of the Florida Deceptive and Unfair Trade Practices Act, and seeks to compel Defendants to adopt reasonably sufficient security practices to safeguard patient PII that remains in their custody in order to prevent incidents like the Data Breach from reoccurring in the future.

## PARTIES

8.      Plaintiff Cherrae Clark is a resident of Jacksonville, Florida, and a patient of NFOBGYN. On or about October 1, 2019, Ms. Clark received notice from NFOBGYN, along with approximately 528,000 other patients, that her sensitive PII had been improperly exposed to unauthorized third parties.

9.      Since the announcement of the Data Breach, Ms. Clark continues to monitor her medical and financial accounts in an effort to detect and prevent any misuses of her personal information.

10.     Ms. Clark has, and continues to spend her valuable time to protect the integrity of her medical and financial accounts —time which she would not have had to expend but for the Data Breach.

11.     Plaintiff suffered actual injury from having her PII stolen as a result of the Data Breach including, but not limited to: (a) paying monies to NFOBGYN for its goods and services which she would not have if NFOBGYN disclosed that it lacked data security practices adequate to safeguard her PII from theft; (b) damages to and diminution in the value of her PII—a form of

3

intangible property that Plaintiff entrusted to NFOBGYN as a condition for health-related services; (c) loss of her privacy; and (d) imminent and impending injury arising from the increased risk of financial fraud, medical fraud and identity theft.

12.     As a result of the Data Breach, Ms. Clark will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and their attendant damages for years to come.

13.     Defendant North Florida Ob-Gyn, LLC is a Florida limited liability company headquartered at 11437 Central Parkway, Suite 105, Jacksonville, Florida 32224. It is the largest independent women's health practice in Jacksonville, providing obstetrics, gynecology and urogynecology services in 38 locations across northern Florida.[2] On May 6, 2019, North Florida Ob-Gyn, LLC merged with Defendant Women's Care Florida.

14.     Defendant Women's Care Florida, LLC is a Florida limited liability company headquartered at 5002 West Lemon Street, Tampa, Florida 33609. It is the largest independent women's health practice in Central Florida.

15.     Defendant Physician Business Services, LLC is a Florida limited liability company headquartered at 5002 West Lemon Street, Tampa, Florida 33609, and serves as the corporate office for Defendants North Florida Ob-Gyn, LLC and Women's Care Florida, LLC.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to Fla. Stat. §26.012 and §86.011. Moreover the amount of damages sought exceeds the jurisdictional minimum of this court.

17.     Plaintiff and Members of the putative Class are Florida residents and patients of NFOBGYN.

18.     Venue is proper in Duval County pursuant to Fla. Stat. §47.011 and §47.051 because Defendant North Florida Ob-Gyn is headquartered and does business in this County, the

---

[2] https://www.nfobgyn.com//community-spirit

4

cause of action accrued in this County, and because Defendant North Florida Ob-Gyn has an office for the transaction of its customary business in this County.

19. This Court has personal jurisdiction over Defendants pursuant to Fla. Stat. §48.193 because at all times relevant, Defendants personally or through an agent (a) operated, conducted, engaged in, or carried on a business or business venture in Florida or had an office or agency in Florida, and (b) committed and continues to commit tortious acts in Florida. Jurisdiction is also proper pursuant to Fla. Stat. §48.193 because at all times relevant hereto, Defendants engaged in substantial activity within Florida.

## STATEMENT OF FACTS

### A. The NFOBGYN Data Breach

20. On July 27, 2019, NFOBGYN discovered that the PII of 528,188 of its patients had been compromised as a result of a breach of its computer systems. NFOBGYN revealed that unauthorized third parties had breached its security on or before April 29, 2019 and for a period of three months had unfettered access to sensitive patient PII. The PII included: patient names, demographic information, dates of birth, Social Security numbers, driver's license or identification card numbers, employment information, health insurance information, and health information, such as treatment, diagnosis, and related information and medical images.

21. Despite becoming aware of the breach on July 27, 2019, NFOBGYN waited 66 days before informing affected patients that their sensitive PII had been compromised.

22. On or about October 1, 2019, NFOBGYN publicly announced the Data Breach stating in relevant part as follows:

> **NOTICE OF DATA BREACH**
> At North Florida OB-GYN, we understand that the confidentiality and security of your medical and personal information is critically important, and we are committed to protecting it. The purpose of this post is to notify patients of a recent cyber incident that affected North Florida OB-GYN and may have resulted in a compromise of certain electronic files containing medical or personal information.

### What Happened

On July 27, 2019, North Florida OB-GYN became aware that a portion of its computer systems were being affected by a cyber incident that we suspect may have begun on or before April 29, 2019. Shortly after becoming aware of the incident, North Florida OB-GYN completed a preliminary assessment, in consultation with third party information technology consultants, and determined that there had been improper access to certain portions of its networked computer systems and that a computer virus had encrypted (made unreadable) certain files on its computer systems. North Florida OB-GYN promptly shut down its networked computer systems, initiated its incident response and recovery procedures, notified the Federal Bureau of Investigation, and began a privileged and confidential forensic investigation. Since then, North Florida OB-GYN has decrypted (made readable again) or recovered virtually all of the affected files and has taken actions to strengthen security safeguards for the affected systems and prevent similar incidents.

There is no evidence to date that any unauthorized person has actually viewed, retrieved, or copied any of medical or personal information. As a precaution, North Florida OB-GYN has sent letters by mail to current and former patients whose medical or personal information may have been on the affected servers. North Florida OB-GYN has also notified the U.S. Department of Health and Human Services Office for Civil Rights and relevant state authorities of this incident.

### What Information Was Involved

The medical or personal information affected by the incident may have included name, demographic information, date of birth, Social Security number, driver's license or identification card number, employment information, health insurance information, and health information, such as treatment, diagnosis, and related information and medical images. The affected computer systems did not contain any credit or debit card or financial account information.

### What We Are Doing

We have strengthened our virus detection and other systems and safeguards to prevent unauthorized persons from gaining access to our systems. We have also taken other steps to try to prevent similar incidents in the future. As an extra precautionary measure, North Florida OB-GYN has provided potentially affected patients with access to identity theft protection services at no charge. Instructions for enrolling in credit monitoring were included in the notification

6

letters and can also be obtained by calling the toll-free number listed below.

**What You Can Do**

North Florida OB-GYN advises patients to remain vigilant by regularly reviewing their account statements, monitoring free credit reports, and reporting to their financial institutions any suspicious activity. Patients and employees may obtain a free copy of their credit report online at www.annualcreditreport.com, by calling toll-free 1-877-322-8228, or by mailing an Annual Credit Report Request Form (available at www.annualcreditreport.com) to: Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA, 30348-5281.

**For More Information**

North Florida OB-GYN has made available a toll-free number for potentially affected patients to call if they have any questions or wish to obtain additional information, 855-913-0607. The hotline operating hours are from 9:00 a.m. to 9:00 p.m. ET, Monday through Friday, excluding major holidays.

North Florida OB-GYN takes the confidentiality and security of medical and personal information very seriously and will continue to take steps to prevent a similar incident from occurring in the future.[3]

### B. Prevalence of Cyber Attacks and Particular Susceptibility of the Healthcare Sector

23. Cyber-attacks come in many forms. According to the terse Notice provided by NFOBGYN, an unauthorized third party gained "improper access" to certain portions of NFOBGYN's computer network where files containing PII were unlawfully exposed and subsequently encrypted by the third party, thereby preventing Defendants' access to them. While NFOBGYN was able to subsequently decrypt and/or recover the affected files, it could not confirm that sensitive PII had not been exfiltrated. Moreover, NFOBGYN did not elaborate as to whether the PII was subject to a ransom, whether a ransom was paid to decrypt the files, or whether the Data Breach was the result of any other malfeasance.

---

[3] Notice of Data Breach ("Notice") available at https://nfobgyn.com/uploads/WCF-WebsiteNotice.pdf

24.     The only fact that is clear, however, is that the Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patient PII.

25.     In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year.4 In 2017, a new record high of 1,579 breaches were reported, representing a 44.7 percent increase over 2016.5

26.     In 2018, the healthcare sector reported the second largest number of breaches among all measured sectors and the highest rate of exposure per breach.6 Indeed, healthcare-related data is among the most sensitive, and personally consequential when compromised. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident…came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.7 Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly one-third said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the entire economy as a whole.8

27.     Healthcare-related data breaches in particular have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months,

---

[4] Identity Theft Resource Center *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017), *available at* https://www.idtheftcenter.org/surveys-studys.

[5]   Identity Theft Resource Center, 2017 Annual Data Breach Year-End Review, available at https://www.idtheftcenter.org/2017-data-breaches/.

[6]   Identity Theft Resource Center, 2018 End -of-Year Data Breach Report. Available at https://www.idtheftcenter.org/2018-data-breaches/.

[7] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[8] *Id.*

with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[9] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[10]

28.     As a healthcare provider, NFOBGYN knew, or should have known, the importance of safeguarding patient PII entrusted to it and of the foreseeable consequences if its data security systems were breached, including the significant costs that would be imposed on its patients as a result of a breach, yet failed to take adequate cyber-security measures to prevent the Data Breach from occurring.

## C. Defendants' Privacy Practices

29.     Defendants maintain a series of privacy policies wherein they express their commitment to protecting patient PII. "[W]e understand that the confidentiality and security of your medical and personal information is critically important, and we are committed to protecting it."[11] Among other things, Defendants make the following commitments to their patients:

> NOTICE OF PRIVACY PRACTICES THIS NOTICE DESCRIBES HOW INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.
>
> At Women's Care Florida D/B/A North Florida Ob-Gyn ("WCF North Florida"), we are committed to treating and using protected health information ("PHI") about you responsibly. This Notice of Privacy Practices ("Notice") describes the personal information we collect, and how and when we use or disclose that information. It also describes your rights as they relate to your PHI. This Notice has been updated in

---

[9] https://www.himss.org/2019-himss-cybersecurity-survey (last visited June 14, 2019).

[10] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

[11] Notice, *supra* n.3.

9

accordance with the HIPAA Omnibus Rules effective March 26, 2013. It applies to all PHI as defined by federal regulations.

- WCF North Florida is required to:
- Maintain the privacy of your PHI.
- Provide you with this Notice as to our legal duties and privacy practices with respect to information we collect and maintain about you.
- Abide by the terms of the Notice currently in effect
- Notify you in writing of a breach where your unsecured PHI has been accessed, acquired, used or disclosed to an unauthorized person. "Unsecured PHI" refers to PHI that is not secured through the use of technologies or methodologies that render the PHI unusable, unreadable, or indecipherable to unauthorized individuals.

We will not use or disclose your PHI without your written authorization, except as described in this Notice.

### D. NFOBGYN Acquires, Collects, and Stores Plaintiff and Class Members' PII

30.     Defendants acquire, collect, and store a massive amount of protected health-related information and other personally identifiable data on its provider patients.

31.     As a condition of engaging in health services, NFOBGYN requires that these patients entrust them with highly sensitive personal information.

32.     By obtaining, collecting, using, and deriving a benefit from Plaintiff and Class Members' PII, NFOBGYN assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff and Class Members' PII from disclosure.

33.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiff and Class Members, as current and former patients, relied on NFOBGYN to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

10

### E. The Value of Personally Identifiable Information and the Effects of Unauthorized Disclosure

34.     NFOBGYN was well-aware that the PII they collect is highly sensitive, and of significant value to those who would use it for wrongful purposes.

35.     Personally identifiable information is a valuable commodity to identity thieves. As the FTC recognizes, with PII identity thieves can commit an array of crimes including identify theft, medical and financial fraud.[12] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII on multiple underground Internet websites.

36.     While credit card information and associated PII can sell for as little as $1 to $2 on the black market, protected health information can sell for as much as $363 according to the Infosec Institute. This is because one's personal health history (e.g. ailments, diagnosis, surgeries, etc.) cannot be changed.[13] PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

37.     In addition to PHI, Plaintiff and Class Members' other PII is also valuable. For example, Social Security numbers are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

38.     The Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used

---

[12] Federal Trade Commission, *Warning Signs of Identity Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft

[13] Center for Internet Security, Data Breaches: In the Healthcare Sector, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/

to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

39.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."14

40.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."15  As explained above, the inclusion of PHI, such as the information exposed here, is even more valuable.16

41.     At all relevant times, NFOBGYN knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences if its data security systems were breached, including, the significant costs that would be imposed on patients as a result of a breach.

---

[14] *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR, Brian Naylor, Feb. 9, 2015, *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[15] *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, Tim Greene, Feb. 6, 2015, *available at* http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[16] *Supra* at n. 12.

### F. *NFOBGYN's Conduct Violates HIPAA*

42.    The Healthcare Insurance Portability and Accountability Act, 42 U.S.C. § 1320 et seq. ("HIPAA"), requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.17

43.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendants left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

44.    Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations. NFOBGYN's security failures include, but are not limited to:

  a. Failing to ensure the confidentiality and integrity of electronic protected health information that Defendants create, receive, maintain, and transmit in violation of 45 CFR §164.306(a)(1);

  b. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR §164.312(a)(1);

  c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR §164.308(a)(1);

---

17 https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/

13

d. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 CFR §164.308(a)(6)(ii);

e. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 CFR §164.306(a)(2);

f. Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 CFR §164.306(a)(3);

g. Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 CFR §164.306(a)(94);

h. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 CFR §164.502, *et seq.*;

i. Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 CFR §164.530(b) and 45 CFR §164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 CFR §164.530(c).

14

### G. Defendants Fail to Comply with FTC Guidelines

45.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[18]

46.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[19] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

47.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[20]

48.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

---

[18]  Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[19]  Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.

[20]  FTC, *Start With Security*, *supra* note 19.

15

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

49.     NFOBGYN failed to properly implement basic data security practices. NFOBGYN's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

50.     NFOBGYN was at all times fully aware of their obligation to protect the PII of patients because of their position as a trusted healthcare provider. NFOBGYN was also aware of the significant repercussions that would result from their failure to do so.

### H. Defendants Fail to Comply with Industry Standards

51.     Data exfiltrated from healthcare providers continues to be a high value target among cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).21 The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record. *Id.* As a result, both the government and private sector have developed industry best standards to address this growing problem.

52.     The Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."22 DHHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience which require a

---

[21] https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; Identity Theft Resource Center, 2018 End of Year Data Brach Report, https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[22] HIPAA Journal, Cybersecurity Best Practices for Healthcare Organizations, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of PII; (b) educating and training healthcare employees on how to identify social engineering attacks; (c) reviewing audit logs regularly in order to identify attempts by unauthorized individuals to gain access to PII/PHI before they result in a data breach; and (d) the correct configuration of software and network devices.

53.     Private cyber security firms have also identified the healthcare sector as being particularly vulnerable to cyberattacks, both because of the value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to cybersecurity threats.23  They too have promulgated similar best practices for bolstering cyber security and protecting against the unauthorized disclosure of PII.

54.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, NFOBGYN chose to ignore them.  Only *after* the Data Breach did NFOBGYN institute and fortify some protections that should have already been in place to prevent incidents such as the Data Breach from occurring.  These best practices were known, or should have been known by NFOBGYN, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of PII.

### I. Plaintiff and Class Members Suffered Damages

55.     The ramifications of Defendants' failure to keep patients' PII secure are long lasting and severe.  Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.  Consumer victims of data breaches are more likely to become victims of identity fraud.24

56.     The PII belonging to Plaintiff and Class Members is private, sensitive in nature, and was left inadequately protected by Defendants who did not obtain Plaintiff or Class Members'

---

23 See e.g., https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry; https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref.

24 2014 LexisNexis True Cost of Fraud Study, https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf.

consent to disclose such PII to any other person, as required by applicable law and industry standards.

57.     The Data Breach was a direct and proximate result of NFOBGYN's failure to: (a) properly safeguard and protect Plaintiff and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

58.     Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite its obligation to protect patient data.

59.     Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into their systems and, ultimately, the theft of PII.

60.     As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands, such as work and family, in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."25

61.     To date, NFOBGYN has merely offered "access to complimentary credit monitoring services."26 The offer, however, is wholly inadequate as it fails to provide for the fact

---

25 U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited April 19,2019).

26 https://www.prnewswire.com/news-releases/NFOBGYN-inc-provides-notice-of-data-security-incident-300884252.html

18

that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and it entirely fails to provide any compensation for the unauthorized release and disclosure of Plaintiff and Class Members' PII.

62. Furthermore, Defendants' credit monitoring offer to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on Defendants, to investigate and protect themselves from Defendants' tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the breach, Defendants merely sent instructions "offering" the services to affected patients recommending they sign up for the services.

63. As a result of Defendants' failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, or are at increased risk of suffering:

    a. The compromise, publication, theft and/or unauthorized use of their PII;

    b. Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

    d. The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the PII in their possession; and

    e. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

64.     In addition to a remedy for the economic harm, Plaintiff and the Class maintain an undeniable interest in ensuring that their PII is secure, remains secure, and is not subject to further misappropriation and theft.

### J. *Defendants' Delay in Identifying & Reporting the Data Breach Caused Additional Harm*

65.     It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."27

66.     Indeed, once a data breach has occurred, "[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).28

67.     Although the Data Breach occurred on or before April 29, 2019, and was discovered three months later, NFOBGYN still took more than *two months* to notify affected patients, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

---

27 *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire, https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million.

28 Consumer Reports, The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too, January 31, 2019, https://www.consumerreports.org/data-theft/the-data-breach-next-door/

68.     As a result of NFOBGYN's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this suit as a class action on behalf of herself and all others similarly situated pursuant to Fla. R. Civ. P. Rule 1.220(b)(2).  Plaintiff seeks certification of a Florida class defined as follows:

> All persons whose PII was compromised as a result of the Data Breach announced by NFOBGYN on or about October 1, 2019 (the "Class").

70.     Excluded from the Class are the officers, directors, and legal representatives of Defendant, and the judges and court personnel in this case and any members of their immediate families.

71.     **Numerosity**. The Class Members are so numerous that joinder of all Members is impractical.  There are 528,188 Class Members who have been affected by the Data Breach and who received notice from Defendants.

72.     **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members.  These common questions of law and fact include, without limitation:

> a.  Whether NFOBGYN had a duty to protect patient PII;
>
> b.  Whether NFOBGYN knew or should have known of the susceptibility of its systems to a data breach;
>
> c.  Whether NFOBGYN's security measures to protect its systems were reasonable in light of best practices recommended by data security experts;
>
> d.  Whether NFOBGYN was negligent in failing to implement reasonable and adequate security procedures and practices;

e. Whether NFOBGYN's failure to implement adequate data security measures allowed the breach of its data systems to occur;

f. Whether NFOBGYN's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the unlawful exposure of Plaintiff and Class Members' PII;

g. Whether Plaintiff and Class Members were injured and suffered damages or other losses because of NFOBGYN's failure to reasonably protect its systems and data network; and,

h. Whether Plaintiff and Class Members are entitled to relief.

73. **Typicality**. Plaintiff's claims are typical of those of other Class Members because her claims originate from the same event. Plaintiff was a NFOBGYN patient whose PII was exposed in the Data Breach. Plaintiff's damages and injuries are akin to other Class Members, and Plaintiff seeks relief consistent with the relief sought by the Class.

74. This class action is also appropriate for certification because Defendants acted on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' actions, inactions, policies and procedures challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

75. **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

22

76.     **Superiority of Class Action**. A class action provides a fair and efficient method for the adjudication of this controversy under the criteria set forth in Fla. R. Civ. P. 1.220. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

77.     The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

78.     The litigation of the claims brought herein are most manageable as a class action. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

23

79.     Finally, the Class is ascertainable from the records maintained by Defendants. From those same records, adequate notice can also be provided to Class Members.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

80.     Plaintiff restates and realleges paragraphs 1 through 79 above as if fully set forth herein.

81.     As a condition of receiving services, Plaintiff and Class Members were obligated to provide NFOBGYN their PII directly or through their respective insurance carriers.

82.     Plaintiff and Class Members entrusted their PII to NFOBGYN with the understanding that NFOBGYN would safeguard their information.

83.     Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

84.     Defendants had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining and testing Defendants' security protocols to ensure that PII in their possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on cyber security measures regarding the security of such information.

85.     Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, the current cyber scams being perpetrated and that they had inadequate employee training and education and IT security protocols in place to secure the PII of Plaintiff and the Class.

86.     Defendants' own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' misconduct included, but was not limited to, their failure to take the steps

24

and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decision not to comply with HIPAA and industry standards for the safekeeping and encrypted authorized disclosure of the PII of Plaintiff and Class Members.

87.     Plaintiff and Class Members had no ability to protect their PII that was in NFOBGYN's possession.

88.     Defendants were in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

89.     Defendants had a duty to put proper procedures in place in order to prevent the unauthorized dissemination Plaintiff and Class Members' PII.

90.     Defendants admitted that Plaintiff's and Class Members' PII was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

91.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff and Class Members' PII while it was within NFOBGYN's possession or control.

92.     Defendants improperly and inadequately safeguarded Plaintiff and Class Members' PII in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

93.     Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of their patients' PII.

94.     Defendants, through their actions and/or omissions, unlawfully breached their duty to adequately disclose to Plaintiff and Class Members the existence, and scope of the Data Breach.

95.     But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and Class Members, Plaintiff and Class Members' PII would not have been compromised.

25

96. There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the PII and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

97. As a result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*

98. Plaintiff restates and realleges Paragraphs 1 through 79 above as if fully set forth herein.

99. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as NFOBGYN, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

100. NFOBGYN violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII and not complying with applicable industry standards, as described in detail herein. NFOBGYN's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

101. NFOBGYN's violation of Section 5 of the FTC Act constitutes negligence *per se*.

102. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

26

103.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

104.     Defendants' violation of HIPAA also independently constitutes negligence *per se*.

105.     HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used, and who it can be disclosed to. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for but to any entity that may have access to healthcare information about a patient that – if it were to fall into the wrong hands – could present a risk of harm to the patient's finances or reputation.

106.     Plaintiff and Class Members are within the class of persons that HIPAA privacy laws were intended to protect.

107.     The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

108.     As a direct and proximate result of NFOBGYN's negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to: damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, and filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

109.     Additionally, as a direct and proximate result of NFOBGYN's negligence *per se*, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remains in NFOBGYN's possession and is subject to further unauthorized disclosures

27

so long as NFOBGYN fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

## THIRD CAUSE OF ACTION
## INVASION OF PRIVACY

110.    Plaintiff restates and realleges paragraphs 1 through 79 above as if fully set forth herein.

111.    Plaintiff and Class Members had a legitimate expectation of privacy with respect to their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

112.    Defendants owed a duty to patients in their network, including Plaintiff and Class Members, to keep their PII confidential.

113.    The unauthorized release of PII, especially the type related to personal health information, is highly offensive to a reasonable person.

114.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members disclosed their PII to Defendants as part of their use of NFOBGYN's services, but privately, with the intention that the PII would be kept confidential and protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

115.    The Data Breach constitutes an intentional interference with Plaintiff and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

116.    Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew that their information security practices were inadequate.

117.    Acting with knowledge, NFOBGYN had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and Class Members.

118.　As a proximate result of Defendants' acts and omissions, Plaintiff and Class Members' PII was disclosed to and used by third parties without authorization, causing Plaintiff and Class Members to suffer damages.

119.　Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the PII maintained by Defendants can be viewed, distributed, and used by unauthorized persons.

120.　Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class.

### FOURTH CAUSE OF ACTION
### BREACH OF IMPLIED CONTRACT

121.　Plaintiff restates and realleges paragraphs 1 through 79 above as if fully set forth herein.

122.　Plaintiff and Class Members were required to provide their PII, including their names, addresses, dates of birth, Social Security numbers, driver's license numbers and various health related information to Defendants as a condition of their use of Defendants' services.

123.　Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendants in exchange for services, along with Defendants' promise to protect their health information and other PII from unauthorized disclosure.

124.　In their written privacy policies, NFOBGYN expressly promised Plaintiff and Class Members that they would only disclose protected health information and other PII under certain circumstances, none of which relate to the Data Breach.

125.　NFOBGYN promised to comply with HIPAA standards and to make sure that Plaintiff and Class Members' health information and other PII would remain protected.

126.　Implicit in the agreement between Plaintiff and Class Members and Defendants to provide protected health information and other PII, was the latter's obligation to: (a) use such PII

29

for business purposes only, (b) take reasonable steps to safeguard that PII, (c) to prevent unauthorized disclosures of the PII, (d) to provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) to reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) to retain the PII only under conditions that kept such information secure and confidential.

127.    Without such implied contracts, Plaintiff and Class Members would not have provided their PII to Defendants.

128.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendants, however, Defendants did not.

129.    Defendants breached the implied contracts with Plaintiff and Class Members by failing to:

> a.   reasonably safeguard and protect Plaintiff and Class Members' PII, which was compromised as a result of the Data Breach.
>
> b.   comply with their promise to abide by HIPAA.
>
> c.   ensure the confidentiality and integrity of electronic protected health information Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).
>
> d.   implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).
>
> e.   implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1).
>
> f.   identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii).

30

g.  to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2).

## FIFTH CAUSE OF ACTION
## BREACH OF CONFIDENCE

130.  Plaintiff restates and realleges paragraphs 1 through 79 above as if fully set forth herein.

131.  At all times during Plaintiff and Class Members' interactions with Defendants, Defendants were fully aware of the confidential and sensitive nature of Plaintiff and Class Members' PII.

132.  As alleged herein and above, Defendants' relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff and Class Members' PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

133.  Plaintiff and Class Members provided their PII to Defendants with the explicit and implicit understandings that Defendants would protect and not permit PII to be disseminated to any unauthorized parties.

134.  Plaintiff and Class Members also provided their PII to Defendants with the explicit and implicit understandings that Defendants would take precautions to protect such PII from unauthorized disclosure.

135.  Defendants voluntarily received in confidence Plaintiff and Class Members' PII with the understanding that the PII would not be disclosed or disseminated to the public or any unauthorized third parties.

136.  Due to Defendants' failure to prevent, detect, or avoid the Data Breach from occurring by, *inter alia*, following industry standard information security practices to secure Plaintiff and Class Members' PII, Plaintiff and Class Members' PII was disclosed and

31

misappropriated to unauthorized third parties beyond Plaintiff and Class Members' confidence, and without their express permission.

137.   As a direct and proximate cause of Defendants' actions and/or omissions, Plaintiff and Class Members have suffered damages.

138.   But for Defendants' disclosure of Plaintiff and Class Members' PII in violation of the parties' understanding of confidence, their protected PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Defendants' Data Breach was the direct and legal cause of the theft of Plaintiff and Class Members' protected PII, as well as the resulting damages.

139.   The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendants' unauthorized disclosure of Plaintiff and Class Members' PII.

140.   As a direct and proximate result of Defendants' breaches of confidence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from medical fraud, financial fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of patients in their continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

141.   As a direct and proximate result of Defendants' breaches of confidence, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

## SIXTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

142.   Plaintiff restates and realleges paragraphs 1 through 79 above as if fully set forth herein.

143.   In light of their special relationship, Defendants have become the guardian of Plaintiff and Class Members' PII. Defendants have become fiduciaries, created by their undertaking and guardianship of patient PII, to act primarily for the benefit of their patients, including Plaintiff and Class Members. This duty included the obligation to safeguard Plaintiff and Class Members' PII and to timely notify them in the event of a data breach.

144.   Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. Defendants breached their fiduciary duties owed to Plaintiff and Class Members by failing to:

a.   properly encrypt and otherwise protect the integrity of the system containing Plaintiff and Class Members' protected health information and other PII;

b.   timely notify and/or warn Plaintiff and Class Members of the Data Breach.

c.   ensure the confidentiality and integrity of electronic protected health information Defendants created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.   implement technical policies and procedures to limit access to only those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

e.   implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

33

f.  to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

g.  to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2);

h.  to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

i.  ensure compliance with the HIPAA security standard rules by their workforce in violation of 45 C.F.R. § 164.306(a)(94).

j.  improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.*;

k.  effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

l.  design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. § 164.530(c); and

m.  otherwise failing to safeguard Plaintiff and Class Members' PII.

145.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect patient PII in their continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

146.    As a direct and proximate result of Defendants' breach of their fiduciary duty, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm.

### SEVENTH CAUSE OF ACTION
### VIOLATION OF FLORIDA'S
### DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

147.    Plaintiff restates and realleges paragraphs 1 through 79 above as if fully set forth herein.

148.    Plaintiff and the Class Members are "consumers." Fla. Stat. § 501.203(7).

149.    Plaintiff and Class Members purchased "things of value" in the form of their goods and services acquired from Defendants. These purchases were made for personal, family, or household purposes. Fla. Stat. § 501.203(9).

150.    Defendants engaged in the conduct alleged in this Complaint by advertising and entering into transactions intended to result, and which did result, in the sale of goods or services, to consumers, including Plaintiff and the Class Members. Fla. Stat. § 501.203(8).

151.     Defendants engaged in, and its acts and omissions affected trade and commerce. Defendants' acts, practices, and omissions were done in the course of Defendants' business of advertising, marketing, offering to sell, and selling and/or renting goods and services throughout Florida and the United States. Fla. Stat. § 501.203(8).

152.     Defendants, operating in Florida, engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

      a.  Representing that they maintained, but in fact failed to maintain adequate computer systems and data security practices to safeguard PII (which also violated Fla. Stat. §§ 568.365(e), (s));

      b.  representing that their data security practices were adequate, but in fact failed to disclose that their computer systems and data security practices were inadequate to safeguard PII from theft (which also violated Fla. Stat. §§ 568.365(e), (s));

      c.  failure to timely and accurately disclose the Data Breach to Plaintiff and the Class Members;

153.     This conduct is considered unfair methods of competition and constitutes unfair and unconscionable acts and practices. Fla. Stat. § 501.204(1).

154.     As a direct and proximate result of Defendants' violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Plaintiff and Class Members suffered actual damages by paying a premium for Defendants' goods and services with the understanding that at least part of the premium would be applied toward sufficient and adequate information security practices that comply with industry standards, when in fact no portion of that premium was applied toward sufficient and adequate information security practices. Fla. Stat. § 501.211(2).

155.    Also, as a direct result of Defendants' knowing violation of FDUTPA, Plaintiff and Class Members are not only entitled to actual damages, but also declaratory judgment that Defendants' actions and practices alleged herein violate FDUTPA, and injunctive relief, including, but not limited to:

a.  Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b.  Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c.  Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

d.  Ordering that Defendants segment PII by, among other things, creating firewalls and access controls so that if one area of Defendants' system is compromised, hackers cannot gain access to other portions of Defendants' systems;

e.  Ordering that Defendants purge, delete, and destroy in a reasonable secure manner PII not necessary for their provision of services;

f.  Ordering that Defendants conduct regular database scanning and securing checks; and

g.  Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

37

Fla. Stat. § 501.211(1).

156. Plaintiff brings this action on behalf of herself and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiff and Class Members and the public from Defendants' unfair methods of competition and unfair, deceptive, fraudulent, unconscionable, and unlawful practices. Defendants' wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

157. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

158. Defendants knew or should have known that the lack of encryption on their computer systems and data security practices were inadequate to safeguard Class Members' PII and that the risk of a data disclosure or theft was high.

159. Defendants' actions and inactions in engaging in the unfair practices and deceptive acts described herein were negligent, knowing and willful, and/or wanton and reckless.

160. Plaintiff and Class Members seek relief under Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*, including, but not limited to, damages, injunctive relief, and attorneys' fees and costs, and any other just and proper relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests the following relief:

      a. An Order certifying this case as a class action;

      b. An Order appointing Plaintiff as the class representative;

c. An Order appointing undersigned counsel as class counsel;

d. A mandatory injunction directing Defendants to hereinafter adequately safeguard the PII of the Class by implementing improved security procedures and measures;

e. An award of damages;

f. An award of costs and expenses;

g. An award of attorneys' fees; and

h. Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: October 15, 2019                    Respectfully submitted,

*/s/ John A. Yanchunis*
John A. Yanchunis
jyanchunis@forthepeople.com
Florida Bar No. 324681
Jonathan B. Cohen
jcohen@forthepeople.com
Florida Bar No. 0027620
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505